CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 17 2005

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

WILLIAM R. COUCH, #186347,

                 Plaintiff,

vs.

JOHN JABE,

Deputy Director Virginia
Department Of Corrections, <u>et</u>. <u>al</u>.

CIVIL ACTION NO.: 7:05-CV-0042

## COMPLAINT UNDER CIVIL RIGHTS ACT, 42 USC § 1983

William R. Couch,
No. 186347
Keen Mountain Correctional Center
Post Office Box 710
Keen Mountain, Virginia 24624-0710

## JURISDICTION

The United States District Court for the Western District of Virginia, Roanoke Division, has jurisdiction over this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

## RELIGIOUS LAND USE AND

## INSTITUTIONALIZED PERSONS ACT  —  APPLICABILITY

Title 42 U.S.C. § 2000cc-1 (b) 1, Religious Land Use And Institutionalized Persons Act applies in any case in which a substantial burden is imposed in a program or activity that receives Federal financial assistance.

In the year 2002, the Commonwealth of Virginia, Department of Corrections (VDOC), received $4.72 million dollars — approximately 0.5 percent of its budget —  from the federal government.  And in 2003 and 2004 VDOC received similar amounts from the federal government, thus triggering the statute's applicability.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

WILLIAM R. COUCH, #186347,

                    Plaintiff,

vs.

CIVIL ACTION NO.: _____

JOHN JABE,

Deputy Director Virginia
Department Of Corrections, et. al.

COMPLAINT UNDER CIVIL RIGHTS ACT, 42 USC § 1983

A.   Petitioner has not begun any other action in state or
     federal court dealing with the same facts involved in this
     action or otherwise relating to petitioner's imprisonment.

B.   Petitioner has filed grievances regarding the facts of this
     complaint, has attached evidence of his exhaustion of all
     available grievance procedures, and has enclosed a verified
     statement indicating the result.

C.   PARTIES

     1.   Defendant John Jabe  was Deputy Director of the Virginia
Department of Corrections, 6900 Atmore Drive, Richmond, Virginia
23261, and was responsible for establishing and authorizing
appropriate policy governing the amount and content of daily meals
provided for those participating in the 2004 Ramadan Fast at all
times during the events described in this complaint.  He is sued
both in his individual and official capacity.

-2-

2.      Defendant Larry Huffman was Regional Director, Western Regional Office, Virginia Department of Corrections, 5427 Peters Creek Road, Suite 250, Roanoke, Virginia 24019, was responsible for reviewing Level-II Grievance complaints to insure that prison officials at Keen Mountain Correctional Center ("the prison") adhere to Department Of Corrections ("D.O.C.") departmental policies and procedures, at all times during the events described in this com- laint. He is sued both in his individual and offical capacity.

3.      Defendant Linda B. Shear was Chief Dietitian for the Virginia Department of Corrections ("VADOC"), 6900 Atmore Drive, Richmond, Virginia 23261, at all times during the events described in this complaint and was responsible for preparing, reviewing, and approving the VADOC Month Of Fasting Menu for all Ramadan Fast participants. She is sued both in her individual and official capacity.

4.      Defendant Kathleen Bassett was the Warden at Keen Mountain Correctional Center, Post Office Box 860, Oakwood, Virginia 24631, at all times during the events described in this complaint and was responsible for reviewing and responding to all Level-I inmate grievance complaints filed by the prison's inmates, and maintained primary institutional-level responsibility for the proper operation of the prison's Food Service Operation. She is sued both in her individual and official capacity.

5.      Defendant R. B. Phillips was Assistant Warden Of Operations at the Keen Mountain Correctional Center, Post Office Box 860, Oakwood, Virginia 24631, at all times during the events described in this Complaint. And Defendant R. B. Phillips

-3-

was responsible for reviewing and responding to Level-I inmate grievance complaints filed by the prison's inmates, and was responsible for the daily operations of the prison. He is sued both in his individual and official capacity.

6.    Defendant K. Pickerel, Major, was the Chief of Security at Keen Mountain Correctional Center, Post Office Box 860, Oakwood, Virginia 24631, at all times during the events described in this complaint and was responsible for all security-related matters at the prison. He is sued both in his individual and official capacity.

7.    Defendant Mike Oslin was Food Service Director at Keen Mountain Correctional Center, Post Office Box 860, Oakwood, Virginia 24631, at all times during the events described and was responsible for preparing, reviewing, approving, and implementing all food service policies and activities at the prison. He is sued both in his individual and official capacity.

D.                    PRELIMINARY STATEMENT

8.    This is a Civil Rights Action filed by William R. Couch, #186347, ("Couch"), a state prisoner incarcerated within the Virginia Department of Corrections. Couch is a Sunni Muslim and has been a Sunni Muslim for approximately 15 years. Couch has been housed at the prison since June 12, 2002. At the prison, the Sunni Muslim Community is referred to as the World Community and is differentiated from the prison's other islamic group known as the Nation Of Islam Community ("N.O.I.").

9.    This Action is for punitive damages and injunctive relief under 42 U.S.C. §1983, and alleges, 1)  a violation  of

Couch's right to freedom of religious expression in violation of the First Amendment to the United States Constitution and the Religious Land Use And Institutionalized Persons Act ("RLUIPA") 42 U.S.C. § 2000cc;  and 2)  a violation of Couch's  right to Equal Protection and Due Process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

10.    Couch alleges that these violations occurred when during his participation in the Ramadan Fast in the year 2004, specifically, October 15, 2004 through November 14, 2004, defendants, 1)  limited Couch's daily caloric intake to approximately 1000 calories, 2)  deprived Couch of adequate daily nutrition, 3)  deprived Couch of all hot meals for 13 consecutive days, 4)  prevented Couch from engaging in the post-Ramadan Eid-Ul-Fitr Prayer and, 5)  deprived Couch of the post-Ramadan Eid-Ul-Fitr Feast.  And Couch alleges that these deprivations are part of a longstanding and continuous pattern of deprivation by defendants of Couch's right to freely exercise  his religious beliefs.

E.               **STATEMENT OF FACTS: CLAIM (I)**

11.    DEFENDANTS DEPRIVED COUCH OF ADEQUATE NUTRITION,AND CALORIES, AND HOT MEALS IN VIOLATION OF COUCH'S RIGHT TO FREEDOM OF RELIGIOUS EXPRESSION UNDER THE FIRST AMENDMENT AND THE RLUIPA, AND HIS RIGHT TO DUE PROCESS AND EQUAL PROTECTION UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.

12.    Islam requires that during the Holy Month of Ramadan[1]

---

[1]    Ramadan is the ninth month of the Arabian lunar calendar. Ramadan is a very sacred month for Muslims because it was in this month that the revelation of the Holy Qur'an began, and fasting as an obligatory institution was prescribed by God. (Holy Qur'an, Ch.2, v. 185; Sahih Muslim Hadith, Vol.2 (of 4), p.136, hadith #1079, n.1).

every Muslim fast between dawn and sunset for 30 consecutive days.

13.     During the fast of Ramadan, 2004, Couch was deprived of one-half to two-thirds of the nutrition and calories the VDOC would have provided Couch had he not fasted during Ramadan.  Per VDOC policy, general population prisoners are to be provided approximately 2800 calories daily. (Exhibit (A): Inmate Request (9/7/05)).  Defendants provided to Couch about 1000 calories.

14.     During each of the 30 days of Ramadan, Couch (and all fast participants) was provided the same refrigerated, pre-prepared, predawn bag meal consisting of:  2 boiled eggs, 2 slices of bread, 1 eight-ounce cup Bran cereal, 1 orange or apple, an 8oz bag of low-fat milk, and 2 sweeteners.

15.     This cold predawn meal was substantially smaller than the hot breakfast served to the nonfasting prison population, that is, for example: 4oz apple juice or orange juice, 1 serving of grits, 2 boiled eggs, 1 slice of turkey ham, 1 seving Home Fries (potatoes), 3 pancakes, 1 pat margerine, one 2oz ladle of syrup, fresh fruit, i.e.,cantelope, banana, orange, or apple, and coffee and milk in unlimited quantity. (Exhibit (B): Menu (1/30/2005 to 2/5/2005).

16.     Prison officials did not provide a lunch meal to any fast participant.  And for the evening meal defendants asserted that VADOC Departmental Operating Procedure ("D.O.P.") No. 601 and 611 required officials to provide Couch identical portions and content as the evening meal served to the nonfasting prison population, with the  exception of pork items. (Exhibit (C): Inmate Complaint (11/4/04)).

17.    Couch here contends that defendants provided him an evening meal, too, that was nutritionally and calorically inadequate. For example, on October 19, 2004, while the prison was on a scheduled quarterly lockdown, defendants served Couch a Ramadan evening meal consisting merely of: 3 slices of individually wrapped cheese, 1 serving of chopped beets, 1 serving of coleslaw. 1 bun, 1 orange, 2 mustard packs, and 12oz grape koolaid. (Exhibit (D): Record of Evening Meals, 10/18/04 through 10/27/04). The aforementioned pre-dawn meal and this evening meal totaled approximately 1000 calories — nearly one-third of the 2800 calories required by VDOC policy.

18.    And the nutritional and caloric deprivation was not limited to the lockdown period. For example, on November 12, 2004, after the lockdown period, defendants served Couch a Ramadan evening meal consisting merely of: 1 serving pinto beans, 1 serving of diced carrots, 1 sweetpotato, 2 slices of wheat bread, 1 orange and orange koolaid. Again, the cold predawn bag meal and this evening meal, together, failed to provide Couch adequate nutrition or calories.

19.    And defendants provided to Couch and the World Community of Muslim fast participants only cold predawn and evening meals throughout the lockdown period but served to the N.O.I. fast participants a different, larger, hot evening meal each of the 30 days of Ramadan. And defendants provided to the nonfasting inmates 2 hot meals during the lockdown and 3 hot meals after lockdown during each day during the month of Ramadan.

20.    And, Couch was unable to supplement his diet with food items purchased through the prison commissary because the prison suspends all commissary food purchases throughout the lockdown period.

-7-

21.    Additionally, outside the lockdown period, during Ramadan, Couch was required to work at his regular prison job as a law-library clerk where he worked Mondays through Fridays at least 6 hours daily.  At his job, and because prison policy prohibits law-library patrons themselves from retrieving any library materials, Couch was required to, inter alia, retrieve and then replace for patrons several hundred volumes of legal cases each day.

22.    Thus, during the month of Ramadan, 2004, and as a result of defendants' actions in depriving Couch of adequate amounts of food, Couch lost approximately 13 pounds.[2]  (See, Cambell v. Cauthron, 623 F.2d 503 (1980), Two sweet rolls and coffee for breakfast, and frozen "t.v." dinners for the noon and evening meals are calorically and nutritionally inadequate. An average-sized sedentary person on this diet could be expected to lose 9 pounds per month. Id. 508).

23.    Moreover, for Couch the qualitative spiritual  experience of the fast was substantially diminished because Couch was constantly hungry.  Couch, in effect, was forced to fast twice during each 24-hour period in that defendants provided Couch 400 to 500 calories at the 5:00am predawn meal, then Couch fasted all day, then defendants provided Couch another 400 to 600 calories at the 6:00pm evening meal, and then Couch, because he had no other food, was forced to "fast" until the following predawn meal.

24.    And the Ramadan spiritual experience was further diminished because Couch was forced contantly to fight to vindicate

---

[2]    Couch is 6 feet-2 inches tall and weighs 232 pounds

his right to exercise his religious beliefs.

F.              Couch Fought To vindicate His Rights.

25.    On about October 10, 2004, five days prior to the
beginning of Ramadan, Defendant Warden Bassett ("Warden") conducted
a walk-through of the B-1 housing unit where she sat at a table and
spoke with Couch.  There, Couch, the liaison to the prison staff
for the World Community, advised the warden that if the prison
locked down during Ramadan, as it did during Ramadan 2003 and 2002,
those observing Ramadan would be deprived of all hot meals through-
out the lockdown, as had occurred in the preceding years.  Couch
further complained that the prison's Food  Service Department would
not provide adequate nutrition or calories to the fast participants.
The warden instructed Couch to document his concerns on an Inmate
Complaint form and send it to her.

26.    On October 15, 2004, the 30-day fast of Ramadan began.
On October 18, 2004, the prison locked down and all inmates were
confined to their cells.

27.    On lockdown the prison delivers to the inmates in
their cells a hot breafast meal and a hot lunch meal, but provides
a cold-bag dinner generally consisting of coldcuts.  However, during
Ramadan the defendants provided to Couch and all World Community
fast participants the same cold bag predawn meal described earlier,
no lunch, and the same cold bag evening meal that was served to
the non-fasting prison population.  The lockdown began on October 18,
2004, and ended on November 1, 2004,  Thus, for 15 consecutive days
neither Couch nor any other World Community fast participant received
other than the sparse, cold, predawn and evening bag meals.

28.    On October 18, 2004, the first day of the lockdown, Couch, pursuant to the warden's instruction, sent to the warden a 3-page Inmate Complaint detailing Couch's dissatisfaction with the nutritionally and calorically inadequate cold food. (Exhibit (E): Inmate Complaint (10/18/04)).

29.    In the Complaint Couch noted that the prison's Institutional Operating Procedure ("I.O.P") No. 4.22.4-7.3 (B) c, supported Couch's request for hot food where the I.O.P. states: Institutional Lockdown; Food Services "As often as can be accomplished within acceptable standards, hot meals — as prescribed by the master menu — would be served."

30.    Couch also proposed two possible alternatives to the cold meals, namely, that prison officials could provide to Couch the hot lunch meal as his evening meal, or officials could serve Couch the same hot evening meal officials served the N.O.I. fast participants.

31.    The N.O.I. fast participants received a hot evening meal throughout the 30 days of Ramadan, including during the lockdown period when the World Community fast participants and the non-fasting prison population were provided cold evening meals.

32.    In the Complaint Couch further explained that the defendants could provide Couch, and all the World Community fast participants, a hot evening meal at de minimus cost to defendants in light of the overall savings to the prison during Ramadan because, "There are 63 and 67 participants observing Ramadan for World Community and N.O.I. respectively.  That is, 130 lunches * 20 days of Ramadan (excluding weekends when lunch is not served)

is 2,600 lunch meals saved by Food Service during Ramadan."
(Exhibit (E), p.2) Id.

33.    Couch further explained that he was only requesting for
himself 15 hot evening meals (one for each day of lockdown during
Ramadan) but that even if the prison officials provided each of
the World Community fast participants a hot evening meal throughout
the lockdown (63 people * 15 evening meals = 945 hot meals) Food
Service would still realize substantial savings during Ramadan.

34.    And Couch further asserted, and asserts in this Action,
that defendants were unfair and punitive toward Couch when, during
lockdown, defendants provided the non-fasting prisoners 2 hot meals
and a cold bag dinner daily, and provided the N.O.I, participants
a cold predawn meal and a hot evening meal daily, but then elected
to feed Couch only cold food for 15 consecutive days.

35.    More importantly, however, Couch complained then,
and asserts now, that defendants violated Couch's constitutional
rights and acted punitively toward him when defendants in effect
forced Couch to choose either to fast during Ramadan or, instead,
to receive adequate nutrition and calories.

36.    Couch argued in his Complaint to the warden, and contends
now, that defendants could easily have compensated for the missed
nutrition and calories by increasing the portions in the predawn
meal and/or the evening meal.

37.    Indeed, defendants already tacitly acknowledge their
responsibility to insure inmates are provided compensatory nutrition
and calories in that defendants do increase the breakfast portions
for the non-fasting prisoners on weekends because the prison does

-11-

not serve lunch on weekends. And when the prison is locked down defendants serve 3 meals even on the weekend because the lockdown meal trays will not accommodate the larger weekend breakfast meal. (Exhibit (F): Inmate Request to Food Service Director (10/23/04)).

38.    And Couch attached to both his Complaint to the warden and his formal Grievance of these matters page no.1208 of <u>Makin v. Colorado Dept. Of Corrections</u>, 183 F.3d 1205, 1208 (10th Cir. 1999), wherein is reflected that the Colorado D.O.C., as part of a settlement agreement resolving a lawsuit alleging that the D.O.C. was inattentive to the needs of its Muslim inmates, agreed to provide to Muslim inmates meals, "between sunset and dawn that were nutritionally equivalent to the three meals provided each day at the regular times." And, "Inmates participating in the fast of Ramadan shall be given the opportunity to receive at least two hot meals during the time period between sunset and dawn for each...day of the fast." Id. at 1208.

39.    Thus, defendants were fully aware and were wholly on notice that their actions in depriving Couch of adequate nutrition and calories simply because Couch chose to fast during Ramadan was in fact a violation of Couch's constitutional right to freely exercise his religious beliefs.

40.    The Warden's response to Couch's Inmate Complaint regarding inadequate nutrition, calories, and hot food was:

> The Ramadan menu has been set by the Department of
> Corrections and we will not deviate from the menu.
> Anyone on the Common Fare Diet can participate but,
> you will only receive the Two Ramadan Meals. Mr.
> Oslin is following the guidelines set forth by the
> Deputy Director, Mr. Jabe in Observance of Ramadan.
> If you have further questions regarding the menu
> please contact Mr. Oslin, Food Service Mgr. or Mr.
> Phillips, Assistant Warden.

(Exhibit (E), p.1 ) Id.

41.    The Warden's answer was nonresponsive in that it failed to address Couch's complaint that defendants were depriving him of adequate nutrition, calories, and hot food in violation of his constitutional rights.

42.    Moreover, regarding the warden's reference to the Common Fare Diet,[3] Couch has never received the diet, has never requested to receive the diet, and nowhere in his Complaint to the warden does Couch make any reference to a Common Fare Diet.    Indeed, the Common Fare Diet has no connection whatever to Ramadan, to Islamic tenets, or to Couch's complaint about inadequate nutrition.

43.    Couch next filed a formal Inmate Grievance to Warden Bassett wherein he complained of the deprivations heretofore detailed in this Action.    (Exhibit (G): Inmate Grievance (12/10/04)).    The warden's Grievance Response stated, in relevant portion, that:

> The Department of Corrections allows voluntary participation in the fast...and posts all pertinent information prior to the beginning so that all inmates wishing to participate may make an informed decision. The definition of fast is to eat very little or abstain from certain foods, especially as a religious discipline.  All Ramadan participants are made well aware by their own Muslim doctrines, as well as the Department of Corrections that their nutritional intake will be limited during the Ramadan fast.

(Exhibit (H): Warden's Grievance Response, p.1 (1/3/05)).    The Warden's response is misleading and inaccurate.

44.    First, though the prison officials did post for the

---

[3]    The Common Fare Diet is a Kosher diet designed to accommodate the religious dietary needs of various faith groups.  Any inmate may apply to receive the Common Fare diet and, if the inmate meets certain religious criteria established by VDOC, may be recommended for the diet by prison officials where final approval for the diet rests with VDOC headquarters in Richmond, Va. (I.O.P.#611-4.0 )

inmate population general information regarding, for example, the times for the predawn and evening meals, and prohibitions about taking the lunch meals, officials did not inform any prisoner that if he chose to fast during Ramadan he would be deprived of more than half of his daily nutrition and calories.  Nor were prisoners informed that if they fasted officials would provide only cold portions for most  of the month of Ramadan.

45.    Secondly, the warden's definition of "fast" —— "To eat very little or abstain from certain foods, especially as a religious discipline" —— is a verbatim quote from the second definition of "fast" presented in <u>The American Heritage Dictionary</u>, Second College Edition (copyright 1999).  However, this narrow dictionary definition does not define the Islamic Fast of Ramadan.

46.    Thirdly, it is true that during Ramadan Muslims limit their intake of nutrition and calories.  However, **limit** is not synonymous with **reduce.**  During Ramadan Muslims limit their intake of nutrition and calories **from dawn until sunset**; from sunset until dawn, however, Muslims may consume unlimited quantities of nutrition and calories.

47.    Finally, while inmate participation in the Ramadan fast was voluntary (from a secular perspective), Couch did not volunteer to forfiet as much as two-thirds of his daily nutrition.

48.    Couch next appealed the warden's Level-I Grievance Response to Defendant Regional Director Huffman.  Huffman's Level-II Response mirrored and upheld the warden's Level-I Response.  (Exhibit (I): Huffman's Level-II Response (1/27/05)).  Huffman's response, however, added that, "Every institution continues to offer

the full meal schedule during the Ramadan month to non-participants."

49.    Simply stated, defendants' Level-I and Level-II response is that because Couch chose to fast he cannot then be heard to complain that he is being starved, that Couch should expect to be starved, and that if Couch does not want to be starved then he must abandon his religious fast and eat the 3 normally scheduled meals.

G.    <u>Couch Sought Intervention By John Jabe And Linda Shear.</u>

50.    Concurrent with his utilization of the grievance procedure Couch discussed his complaints with Assistant Warden Phillips who explained to Couch that Phillips' "hands [were] tied" by D.O.C. policy.  Phillips advised Couch to address his complaints directly to D.O.C. Dietitian Linda Shear.

51.    On January 4, 2005, Couch mailed to Deputy Director John Jabe and D.O.C. Dietitian Linda Shear, individually, a Certified Mail/Return Receipt Requested, 2-page correspondence entitled, <u>Legal Notice and Demand for Action</u>.  (Exhibit (J): Correspondence to Jabe and Shear).  Therein Couch detailed his complaints of food deprivation and he alleged a "deprivation of my constitutional right to freely exercise my religious beliefs."  Couch concluded his letter by asking Jabe and Shear to "take any action necessary to insure that henceforth this facility provides nutritionally and calorically adequate meals to those prisoners who fast during the holy month of Ramadan."  Mr. Jabe and Ms.Shear received Couch's correspondence on January 3, 2005, and January 5, 2005, respec- tively.  (Exhibit (K): Certified Mail Receipts for Jabe and Shear). Mr. Jabe failed to respond.

52.    However, by letter dated February 4, 2005, Dietitian Shear