# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **WILLIAM R. COUCH,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:05cv00642 |
| v. | ) | |
| | ) | |
| **JOHN JABE, et al.,** | ) | **MEMORANDUM OPINION** |
| Defendants | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |
| | ) | |

Plaintiff, William R. Couch, an inmate at Keen Mountain Correctional Center in Buchanan County, Virginia, ("Keen Mountain"), filed this action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000, ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, against numerous Commonwealth of Virginia Department of Corrections, ("VDOC"), employees in both their individual and official capacities.[1] Jurisdiction over this matter is based upon 28 U.S.C. §§ 1331 and 1343. The case is before the undersigned magistrate judge by consent of the parties pursuant to 28 U.S.C. 636(c)(1).

In his complaint, (Docket Item No. 1), and in his amended complaint, (Docket Item No. 21), Couch alleges that the defendants violated his right to freedom of religious expression in violation of the First Amendment and RLUIPA, and that the

---

[1]The defendants are John Jabe, Deputy Director of the VDOC; Larry Huffman, Regional Director of the Western Regional Office of the VDOC; Linda B. Shear, Chief Dietician for the VDOC; Kathleen Bassett, Warden at Keen Mountain; R. B. Phillips, Assistant Warden of Operations at Keen Mountain; K. Pickerel, Major, Chief of Security at Keen Mountain; and Mike Oslin, Food Service Director at Keen Mountain.

Case 7:05-cv-00642-PMS    Document 49    Filed 09/22/06    Page 1 of 53    Pageid#: 452

defendants violated his right to equal protection and due process in violation of the Fifth and Fourteenth Amendments. The case is now before the court on the defendants' motion for summary judgment, (Docket Item No. 13).

Based on my review of the evidence provided and the written arguments and representations of the parties, and for the reasons set forth below, I will grant the motion in part and deny it in part.

## I. Facts and Analysis

### A. Statutes of Limitations and PLRA Issues

In his complaint and amended complaint, Couch makes the following claims:

1. During Ramadan 2002:

   a. the defendants denied him of adequate nutrition and calories; and

   b. the defendants deprived him of all hot meals during a quarterly lockdown period which coincided with part of Ramadan.

2. During Ramadan 2003:

   a. the defendants deprived him of adequate nutrition and calories;

   b. the defendants deprived him of all hot meals during a quarterly lockdown period which coincided with part of Ramadan;

   c. the defendants deprived him of the *Eid ul Fitr* meal; and

   d. the defendants deprived him of the *Eid ul Fitr* prayer service.

3. During Ramadan 2004:

   a. the defendants deprived him of all hot meals during a quarterly

lockdown period which coincided with part of Ramadan; and

    b.  the defendants deprived him of the *Eid ul Fitr* prayer service.

4.  During Ramadan 2005:

    a.  the defendants deprived him of adequate nutrition and calories;

    b.  the defendants deprived him of the *Eid ul Fitr* meal; and

    c.  the defendants deprived him of the *Eid ul Fitr* prayer service.

Before addressing the defendants' summary judgment motion, however, I note that a couple of Couch's claims do not appear viable under the appropriate statutes of limitations periods. Also, it appears that Couch has not properly exhausted his administrative remedies with regard to each of his claims. Therefore, pursuant to 28 U.S.C. § 1915A(b) and Federal Rule of Civil Procedure Rule 12(h)(3), I will first address these issues. I will address each of Couch's claims relating to the condition of the food during Ramadan before turning to Couch's claims regarding the *Eid ul Fitr* observances. Regarding the exhaustion issue, it is important to note that the defendants have not raised this as a basis for their summary judgment motion. That being the case, the court will determine only if Couch has properly pleaded exhaustion of his administrative remedies. The court's analysis on this issue is based on Couch's representation that he attached copies of all documentation demonstrating exhaustion to his complaint. The defendants have provided no evidence challenging any of the documentation provided to the court by Couch.

Case 7:05-cv-00642-PMS   Document 49   Filed 09/22/06   Page 3 of 53   Pageid#: 454

### 1. Inadequate Nutrition and Calories and Lack of Hot Meals

Couch, a Sunni Muslim,[2] alleges in his complaint and amended complaint that the defendants deprived him of adequate nutrition and calories during Ramadan[3] 2002, 2003 and 2005. Couch further alleges that the defendants deprived him of all hot meals during regularly scheduled lockdowns which coincided with part of Ramadan 2002, 2003 and 2004.

#### i. Statutes of Limitations

##### a. Claims Brought Under § 1983

Although no specific federal statute of limitations applies to § 1983 actions, the Supreme Court in *Wilson v. Garcia*, 471 U.S. 261, 2279-80 (1985), held that for statute of limitations purposes, all § 1983 actions would be characterized as tort actions for the recovery of damages for personal injuries and held that the state statute of limitation for personal injury applies to all § 1983 claims. The Commonwealth of

---

[2]In his complaint, Couch explains that there are two groups of Muslim inmates at Keen Mountain. These two groups are the Sunni Muslims, which comprise the World Community, of which Couch is a member and for which he is the current liaison at the prison, and the Nation of Islam, ("NOI").

[3]According to Couch's complaint, Ramadan is the ninth month of the Arabian lunar calendar. It is a very sacred month for Muslims because it was in this month that the revelation of the Holy Qur'an began and fasting as an obligatory institution was prescribed by God. Islam requires that every Muslim fast between dawn and sunset for 30 consecutive days. Couch also notes that for Muslims, Ramadan is a month of heightened spiritual observances, including fasting and increased prayer. It is a time of peace and tranquility wherein the Muslim aspires to a closer connection with his Creator. During Ramadan, Muslims are specifically enjoined to avoid arguments and disputes.

-4-

Virginia has a two-year statute of limitations period for personal injury actions which applies in § 1983 actions. *See* VA. CODE ANN. § 8.01-243(A); *Lewis v. Richmond City Police Dep't*, 947 F.2d 733, 735 (4th Cir. 1991). That being the case, Couch must show that he filed his complaint within the applicable two-year statute of limitations period for all of his claims brought under § 1983.

In his complaint and amended complaint, Couch alleges that the defendants deprived him of all hot meals during part of Ramadan 2002, 2003 and 2004 and that they supplied him inadequate nutrition and calories during Ramadan 2002, 2003 and 2005. The pleadings do not reflect the exact dates that Keen Mountain observed Ramadan during 2002. However, because Couch's complaint was filed on October 17, 2005, it is clear that any claims arising in 2002 are barred by the applicable two-year statute of limitations for claims brought under § 1983. For this reason, I must dismiss Couch's claims brought under § 1983 for alleged deprivations occurring in 2002. Ramadan of 2003 was observed at Keen Mountain from October 26, 2003, through November 24, 2003. Thus, Couch's complaint, filed October 17, 2005, was within the two-year limitations period applicable to § 1983 claims. Finally, because Couch's remaining claims of inadequate nutrition and calories and the lack of hot meals relate to Ramadan of 2004 and 2005, it is clear that those claims fall within the two-year limitations period for § 1983 claims.

### b. Claims Brought Under RLUIPA

RLUIPA does not contain its own statute of limitations period. However, in 1990, Congress enacted 28 U.S.C. § 1658, which provides a four-year statute of

limitations period for federal civil actions "arising under an Act of Congress enacted after [December 1, 1990]."  Specifically, § 1658(a) states as follows:

> Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

28 U.S.C.A. § 1658(a) (West 1994 & Supp. 2006).  Section 1658 was enacted on December 1, 1990.  Thus, according to the terms of the statute, any federal civil action arising under an Act of Congress enacted after December 1, 1990, is subject to the four-year statute of limitations period contained therein.

There was some debate among the circuits, the Fourth Circuit not being one, as to when a state's statute of limitations period for personal injury actions or this federal "catch all" statute of limitations period would apply.  For instance, in *Zubi v. AT&T Corp.*, 219 F.3d 220 (3d Cir. 2000), a case dealing with a claim brought under 42 U.S.C. § 1981, the Third Circuit held that the state's two-year statute of limitations period applied rather than the four-year catch all because the four-year catch all applied only when Congress established a new cause of action without reference to preexisting law.  Likewise, in *Madison v. IBP, Inc.*, 257 F.3d 780 (8th Cir. 2001), again a case involving a § 1981 claim, the Eighth Circuit held, based on the reasoning set forth in *Zubi*,  that because § 1981 did not have its own limitations period, courts should employ the statute of limitation provided by the state's law for personal injury cases.  It does not appear that the Fourth Circuit has addressed this issue.  In any event, the United States Supreme Court decided this issue once and for all in *Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369 (2004).  In *Jones*, the Court abrogated the holdings in *Zubi* and *Madison* by holding that a cause of action "aris[es] under an Act

-6-

of Congress enacted" after December 1, 1990, and is, therefore, governed by the federal four-year catch all statute of limitations, if the plaintiff's claim against the defendant was made possible by a post-1990 enactment. 541 U.S. at 382. In *Jones*, the Court held that, in the context of a § 1981 claim, the plaintiffs' hostile work environment, wrongful termination and failure to transfer claims arose under the amendment to § 1981 contained in the Civil Rights Act of 1991. *See* 541 U.S. at 383. Therefore, the Court held that these claims were governed by the four-year catch all statute of limitations period for claims arising under an Act of Congress enacted after December 1, 1990, because their causes of action were made possible by the Act when the claims alleged violations of the amended statute, and did not allege a violation of the pre-1990 version of § 1981. *See* 541 U.S. at 383.

While I can find no court that has addressed this statute of limitations issue in the context of a claim brought under RLUIPA, it appears that the reasoning should be the same as that employed by the Court in *Jones*. RLUIPA was enacted in September 2000. There is no doubt that RLUIPA created a new right of action which Couch seeks to invoke in his complaint and amended complaint. Thus, I find that the four-year statute of limitations under § 1658 applies to Couch's claims brought under RLUIPA. That being the case, I find that all of Couch's claims brought under RLUIPA, including those relating to Ramadan 2002, are timely.

### ii. *Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act of 1995, ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), amended 42 U.S.C. § 1997e making it mandatory that a prison

Case 7:05-cv-00642-PMS   Document 49   Filed 09/22/06   Page 7 of 53   Pageid#: 458

inmate exhaust his administrative remedies before filing a civil rights suit based on prison conditions. This section states:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C.A. § 1997e(a) (West 2003).

This court previously has held that the exhaustion requirement of the PLRA applies to inmates seeking monetary damages, although such damages are not available through a prison grievance system. *See Osbourne v. Deeds*, Civil Action No. 7:99cv00774 (June 8, 2001). The United States Supreme Court also has addressed this issue, holding that under the PLRA, a particular remedy need not be available through the prison's administrative process in order for the PLRA exhaustion requirement to apply. *See Booth v. Churner*, 532 U.S. 731, 741 (2001).

Here, VDOC Departmental Operating Procedure, ("DOP"), 866 requires that, prior to submitting a formal grievance, an inmate must submit an informal complaint. The staff member to whom the informal complaint is directed should respond to the complaint within 15 calendar days. DOP 866 further requires an inmate to file a grievance within 30 calendar days from the date of the incident except under certain prescribed circumstances. Under DOP 866, an inmate is required to prove that he has sought informal resolution of his complaint by either attaching a copy of his informal complaint to his grievance or by stating the response to his informal complaint on the grievance form. An inmate who does not receive a response to his informal complaint

should file a formal grievance within 30 days and note that he did not receive any response to his informal complaint. The prison warden or superintendent must respond to an inmate grievance within 30 days. This initial consideration of an inmate's grievance by the warden or superintendent is referred to as Level I. DOP 866 also provides that an inmate who is dissatisfied with the determination on a grievance at Level I may appeal. The review that occurs is referred to as Level II. Under DOP 866, all grievances are appealable through at least Level II. Certain specific grievances may be appealed to an additional level, Level III. Moreover, DOP 866-7.16(4) states: "Expiration of a time limit ... at any stage of the process shall qualify the grievance for appeal to the next level of review."

### a. 2002 Claims Under RLUIPA

A review of the documentation attached to Couch's complaint reveals that Couch failed to exhaust his administrative remedies with regard to any of his claims relating to the defendants' actions occurring in 2002 brought under RLUIPA. That being the case, I must dismiss all such claims. Thus, due to both the expiration of the applicable statute of limitations on Couch's § 1983 claims relating to 2002 and, now, given Couch's failure to exhaust his administrative remedies for any of his 2002 claims brought under RLUIPA, all of Couch's claims relating to 2002 are dismissed.

### b. 2003 Claims

-9-

Documents submitted by Couch with his complaint show that he properly exhausted his administrative remedies for his claims that he was served exclusively cold meals during the regularly scheduled quarterly lockdown period which coincided with part of Ramadan 2003. However, Couch did not provide documentation showing that he exhausted his administrative remedies for his claim that he was deprived of adequate nutrition and calories during Ramadan 2003. The documentation provided by Couch shows that Couch filed an informal complaint directed to Mike Oslin, Food Service Manager at Keen Mountain, on November 11, 2003, complaining of receiving no hot meals during lockdown. Oslin responded on November 13, 2003, stating that the meals were being served according to VDOC policy. Couch filed a grievance on November 13, 2003, to which he properly attached a copy of his informal complaint, again complaining of the lack of hot meals during lockdown. On December 2, 2003, Warden Kathleen Bassett determined that Couch's grievance was unfounded. On December 6, 2003, Couch appealed to Larry Huffman, the Regional Director of the VDOC. On December 17, 2003, Huffman upheld Warden Bassett's determination. Thus, I find that Couch has properly exhausted his administrative remedies for his 2003 claim as it relates to the deprivation of hot meals during a lockdown period that coincided with part of Ramadan. However, I further find that Couch has not exhausted his administrative remedies for his claim of receiving inadequate nutrition and calories during Ramadan 2003. That being the case, I will dismiss Couch's 2003 claim that he received inadequate nutrition and calories during Ramadan 2003 for failure to exhaust his administrative remedies under the PLRA.

c. 2004 Claims

-10-

Documents submitted by Couch regarding his 2004 claims show that he properly exhausted his administrative remedies for his claim of receiving inadequate calories and nutrition during Ramadan, but that he has not properly exhausted his administrative remedies for his claim that he was deprived of hot meals during a regularly scheduled lockdown, part of which coincided with Ramadan. On November 13, 2004, Couch submitted an informal complaint to Oslin, stating that the dinner meal for the fasting World Community members was the same as that served to the general population inmates. He further stated that the portion size for the dinner meal for the fasting World Community inmates was the same as that served to the general population inmates. He asked why this was the case. On November 4, 2004, Oslin replied that the portions were in compliance with departmental policies and procedures. On October 18, 2004, Couch filed an informal complaint stating that no hot meals were served to the fasting members of the World Community during lockdown which coincided with part of Ramadan 2004. He also complained about portion size during Ramadan 2004, which he alleged resulted in inadequate nutrition and calories. On October 22, 2004, Warden Bassett responded that the Ramadan menu had been set by the VDOC and would not be deviated from. She further explained that fasting members of the World Community would receive only two meals during Ramadan and that Oslin was following VDOC guidelines set forth by Deputy Director John Jabe. Warden Bassett instructed Couch to direct further questions regarding the Ramadan menu to Oslin or to Assistant Warden R. B. Phillips. On October 23, 2004, Couch submitted another informal complaint to Oslin asking why, during normal operations on the weekends, the general population was served only two meals, but on weekends during lockdown, the general population was served three meals. On November 4, 2004, Oslin responded that DOP 601 allows

modifications for lockdowns and/or emergency situations.  He further stated that distribution logistics prevented serving only two meals during lockdown due to larger portion sizes.  On December 10, 2004, Couch submitted a grievance regarding the alleged deprivation of at least one-third of his daily caloric intake and nutritional needs.  Couch attached a copy of the response he received from Oslin on November 4, 2004, to his grievance.  Couch's grievance was marked as being received on December 15, 2004.  On January 3, 2005, in her Level-I response, Warden Bassett determined that Couch's grievance was unfounded.  On January 4, 2005, Couch appealed the Level-I response to Huffman.  Huffman's Level-II response, dated January 27, 2005, upheld Warden Bassett's determination.

Although it is clear from the above documents tendered by Couch in connection with his pleadings in this case that he submitted informal complaints with regard to *both* the allegation of being denied hot meals during a lockdown that coincided with part of Ramadan 2004 *and* the allegation that he was denied adequate caloric and nutritional intake during Ramadan 2004, he has exhausted his administrative remedies only with respect to his claim regarding inadequate calories and nutrition.  Thus, I will dismiss Couch's claim that he was denied hot meals during a lockdown that coincided with part of Ramadan 2004 for failure to exhaust his administrative remedies under the PLRA.

### d.  2005 Claims

In his supplemental pleadings, Couch alleges, *inter alia*, that he also was denied adequate calories and nutrition during Ramadan 2005. However, he has filed no informal complaints and/or grievances along with his supplemental pleadings showing that he has exhausted his administrative remedies regarding this claim. There being no evidence before this court that Couch has exhausted his administrative remedies, I will dismiss the claim that he received inadequate calories and nutrition during Ramadan 2005 on that basis.

### 2. Claims Regarding the Eid ul Fitr Observances[4]

#### i. Exhaustion of Administrative Remedies

##### a. 2003 Claims

Couch alleges that during Ramadan 2003, the defendants denied him the *Eid ul Fitr* meal as well as the *Eid ul Fitr* prayer service. However, the documents submitted by Couch show that he grieved only his claim that the *Eid ul Fitr* meal was served *during* Ramadan 2003, as opposed to *after* Ramadan, as required by Islamic tenets, thereby, in essence, denying him the meal. Specifically, Couch filed a grievance on January 20, 2004, stating that the *Eid ul Fitr* meal was served during

---

[4]According to Couch, the *Eid ul Fitr* observance, consisting of the *Eid ul Fitr* meal and the *Eid ul Fitr* prayer service, is an important observance in Islam that commemorates and celebrates the 30-day fast of Ramadan. The *Eid ul Fitr* prayer is a congregational prayer that must be performed during the morning on the first day following the completion of Ramadan. The *Eid ul Fitr* meal must be held at a time between the first and third day after the completion of Ramadan. The meal typically begins on the evening of the first day following the completion of Ramadan and after the morning *Eid ul Fitr* prayer service.

-13-

Ramadan as opposed to after Ramadan. Although he did not attach a copy to his grievance, Couch noted that his informal complaint already was on file. On February 5, 2004, the Level-I response from someone representing Warden Bassett[5] stated that Couch had, in fact, attached to his grievance a response to his informal complaint from a human rights advocate at Keen Mountain, stating that Couch's grievance was unfounded based on DOP 601 and Jabe's memoranda dated September 15, 2003, and November 24, 2003. Couch appealed this Level-I response to Huffman. However, Huffman upheld the Level-I response on February 16, 2004.

Thus, while Couch has properly exhausted his administrative remedies with regard to his claim that he was deprived of the *Eid ul Fitr* meal during 2003, he has failed to exhaust his administrative remedies regarding his claim that he was denied the *Eid ul Fitr* prayer service during 2003. That being the case, I will dismiss that claim.

### b. 2004 Claims

Couch alleges that during Ramadan 2004, the defendants deprived him of the *Eid ul Fitr* prayer and the *Eid ul Fitr* meal. I first find that Couch has exhausted his administrative remedies with regard to his claim that he was denied the *Eid ul Fitr* prayer. In particular, Couch has submitted documents showing that he filed a grievance on December 12, 2004, stating such a denial. In that grievance, Couch stated that he was attaching the response to the informal complaint regarding the same issue. In the Level-I response, Warden Bassett noted that Couch had, in fact, attached

---

[5]This signature is illegible.

to his grievance a response from Assistant Warden Phillips, dated November 29, 2004, advising Couch that his request had been sent to security for a response. Warden Bassett determined that Couch's grievance was unfounded because he was instructed by memorandum dated November 10, 2004, that the *Eid ul Fitr* prayer service and the *Eid ul Fitr* meal would be held in the dining halls on November 17, 2004, at 6:00 p.m. On January 6, 2005, Couch appealed the Level-I response to Huffman. In his Level-II response, Huffman upheld Warden Bassett's determination that Couch's grievance was unfounded.

From the documents filed with the court, it is clear that Couch has properly exhausted his administrative remedies with regard to his claim that he was denied the *Eid ul Fitr* prayer following Ramadan 2004. However, as regards Couch's claim that he was denied the *Eid ul Fitr* meal following Ramadan 2004, I find that he has submitted no documents to show that he properly exhausted his administrative remedies. That being the case, I will dismiss such claim for failure to exhaust under the PLRA.

### c. 2005 Claims

In his supplemental pleadings, Couch alleges that the defendants deprived him of the *Eid ul Fitr* meal following Ramadan 2005 and that they deprived him of the *Eid ul Fitr* prayer service following Ramadan 2005. For the following reasons, I find that Couch has properly exhausted his administrative remedies regarding his claim that the defendants deprived him of the *Eid ul Fitr* meal, but he has provided no evidence to the court that he has exhausted his administrative remedies with regard to the denial

-15-

of the *Eid ul Fitr* prayer service following Ramadan 2005.

Couch has filed documents showing that he submitted an informal complaint on November 7, 2005, stating that the *Eid ul Fitr* meal was improperly served more than three days after Ramadan ended. He further stated that fasting began with the predawn meal on October 5, 2005, and ended after a full day of fasting on November 4, 2005. Couch stated that this constituted 31 days of fasting, in violation of Islamic tenets and DOP 601. The November 9, 2005, response stated that Ramadan ended at Keen Mountain in accordance with Jabe's directive. Thereafter, Couch submitted a grievance,[6] to which he properly attached the informal complaint, again noting that Keen Mountain had improperly held the *Eid ul Fitr* meal more than three days after Ramadan ended. He again noted that fasting had improperly occurred for 31 days. Warden Bassett responded to Couch's grievance on December 27, 2005.[7] Warden Bassett stated that an investigation revealed that Jabe sent a memorandum dated August 29, 2005, stating that Ramadan would start on the evening of October 5, 2005, and would end on the evening of November 4, 2005. However, on September 21, 2005, Jabe sent a corrective memorandum stating that religious observances would start on the evening of October 4, 2005, with the first full day of Ramadan beginning October 5, 2005. Warden Bassett stated that Keen Mountain Food Service followed the memorandum sent by Jabe observing the first full day of Ramadan starting

---

[6] It appears that Couch submitted this grievance on November 17, 2005, but the date is difficult to read as a "Received" stamp has been placed directly over the date that Couch submitted the grievance. Furthermore, it is a logical assumption that Couch submitted the grievance on November 17, 2005, since it was marked as received on November 21, 2005.

[7] Warden Bassett noted that the original response to Couch's grievance was submitted on December 17, 2005, but that additional evidence had since been discovered.

-16-

October 5, 2005, and continuing through November 4, 2005. Moreover, Warden Bassett stated that the *Eid ul Fitr* meal was served on the third day following the prayer service. She further noted that a memorandum dated August 29, 2005, by Jabe stated that the religious observances of the World Community and the NOI would coincide and would start on the evening of October 5, 2005, and would continue for 30 calendar days until the evening of November 4, 2005.

Warden Bassett noted that Jabe's August 29, 2005, memorandum stated as follows:

> Once again this year the above religious observances will coincide and will start on the evening of October 5th and continue for 30 calendar days until the evening of November 4th. Food Service Manual Chapter 4 Section IV (G) states Eid ul-Fitr - prayer and fast breaking - This is a required holy day at the end of Ramadan that may be permitted for persons participating in Ramadan. The activities include a prayer service to be held before noon and a special meal. The special meal may be served on that day or may be held within three (3) days following the prayer service. Only one day may be selected. The EID meal consists of regular menu items.

(Attachment No. 3 to Docket Item No. 21).

Thus, Warden Bassett determined that Couch's grievance was unfounded. Couch appealed this Level-I response, stating that Keen Mountain officials erred by beginning the first full day of fasting on October 5, 2005, according to Jabe's September 21, 2005, memorandum, but ending the fast on November 4, 2005, according to Jabe's August 29, 2005, memorandum.

-17-

In the Level-II response, Huffman noted that Couch's claim that the *Eid ul Fitr* meal was improperly held more than three days after Ramadan ended had been investigated and that such investigation revealed that Keen Mountain had held Ramadan in accordance with Jabe's September 21, 2005, memorandum and that the *Eid ul Fitr* meal was served on the third day following the prayer service as outlined as permissible in the Food Service Manual. In upholding Warden Bassett's Level-I response, Huffman noted that departmental policies and procedures had been followed, and that Jabe's September 21, 2005, memorandum and DOP 601 governed the issue.

For all of these reasons, I find that Couch has properly exhausted his administrative remedies with regard to his claim that he was deprived of the *Eid ul Fitr* meal following Ramadan 2005. However, because Couch has failed to provide documentation showing that he has exhausted his administrative remedies with respect to his claim that he was denied the *Eid ul Fitr* prayer service, I will dismiss that claim.

Thus, after analyzing all of Couch's claims under the appropriate statutes of limitations and the PLRA's exhaustion requirement, the following of Couch's claims remain:

1. 2003 Claims:

   a. That the defendants deprived Couch of all hot meals during a quarterly lockdown period that coincided with part of Ramadan; and

   b. That the defendants deprived Couch of the *Eid ul Fitr* meal.

2. 2004 Claims:

   a. That the defendants deprived Couch of adequate nutrition and

calories; and

    b.  That the defendants deprived Couch of the *Eid ul Fitr* prayer service.

3.  2005 Claim:

    a.  That the defendants deprived Couch of the *Eid ul Fitr* meal.


*B. Summary Judgment Analysis*


That being said, I will now address the defendants' motion for summary judgment with regard to these remaining claims.      Pursuant to Federal Rule of Civil Procedure 56(c), the court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990)(en banc), *cert denied*, 498 U.S. 1109 (1991); and *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).  A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.


In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Inc.*, 475 U.S. at 587-88; *Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 850 (4th Cir. 1990); *Ross*, 759 F.2d at 364;

-19-

*Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir. 1980). In other words, the nonmoving party is entitled "to have the credibility of his evidence as forecast assumed." *Miller*, 913 F.2d at 1087 (quoting *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979)). Therefore, in reviewing the defendants' motion, the court must view the facts and inferences in the light most favorable to Couch.

Courts have held that although inmates lose some constitutional protections upon incarceration, they retain the right to freely worship while in prison. *See McManus v. Bass*, 2006 WL 753017 at *4 (E.D. Va. Mar. 22, 2006) (citing *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987); *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)). The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . . " U.S. CONST. amend. I. In order to establish a right under the Free Exercise Clause, Couch must make two threshold showings. First, Couch must show that he sincerely holds his religious beliefs. *See Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972). Second, Couch must show that his claims are rooted in religious belief and are not "purely secular." *Yoder*, 406 U.S. at 215-16. Next, pursuant to the Supreme Court's decision in *Turner v. Safley*, 482 U.S. 78, 89 (1987), when a prison regulation impinges on an inmate's constitutional rights, "the regulation is valid if it is reasonably related to legitimate penological interests."

Evaluating a statutory violation under RLUIPA involves the same threshold issues as invoked by the Free Exercise Clause for the most part. RLUIPA prohibits a prison institution from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution . . ." Unless the prison can show that

-20-

"imposition of the burden . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling interest." 42 U.S.C.A. § 2000cc-1(a) (West 2003). RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.A. § 2000cc-5(7)(A) (West 2003). As under the First Amendment, although prison officials may not question the truth of an inmate's belief, an inmate must demonstrate that the belief is sincerely held in order to establish a protected right under RLUIPA. *See McManus*, 2006 WL 753017 at *5 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Under both the First Amendment and RLUIPA, Couch must show that his right to the free exercise of his religion has been "substantially burdened." *McManus*, 2006 WL 753017 at *5 (quoting *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989)); *see also* 42 U.S.C.A. § 2000cc-1(a) (West 2003).

Here, I find that it is undoubted that Couch holds a sincere belief in his religion. Couch states in his complaint that he has been a Sunni Muslim for approximately 15 years. Furthermore, in addition to fasting for at least the previous four years during Ramadan while incarcerated, he also was, at least at the time of the filing of his complaint, the liaison between the inmates and the staff at Keen Mountain for the World Community. Moreover, I note the defendants have not questioned whether Couch sincerely holds his religious beliefs. I find that these facts, viewed in the light most favorable to Couch, demonstrate Couch's sincerely held beliefs as a Sunni Muslim. Furthermore, there simply is no evidence that Couch's beliefs are not rooted in religious beliefs or are purely secular in nature, and the defendants make no such claim.

-21-

Next, under both the First Amendment analysis and the RLUIPA analysis, Couch must show that his right to freely exercise his religion has been "substantially burdened" by the defendants' actions. RLUIPA does not define "substantial burden," and the courts that have addressed this issue, the Fourth Circuit not being one, are in disagreement. The Second Circuit, in *McEachin v. McGuinnis*, 357 F.3d 197, 202 n.4 (2d Cir. 2004), held that a substantial burden exists in a situation where "the state 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). The Fifth Circuit has held that a government action or regulation creates a substantial burden on "a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559, 569-70 (5th Cir. 2004). The Seventh Circuit has held that a substantial burden results from a regulation that "necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003), *cert. denied*, 541 U.S. 1096 (2004). The Eighth Circuit, quoting *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997), which defined substantial burden in the context of a claim brought under the Religious Freedom Restoration Act, ("RFRA"),42 U.S.C. § 2000bb *et seq.*,[8] defined substantial burden under RLUIPA as follows:

---

[8]The Supreme Court's decision in *City of Boerne v. Flores*, 521 U.S. 507 (1997), invalidated RFRA as it applied to states and localities. Although RFRA continued to apply to the federal government, in September 2000, Congress attempted to reinstate RFRA's protection against government burdens on religious exercise imposed by states and localities by enacting RLUIPA.

-22-

[t]o constitute a substantial burden, the government policy or actions: must 'significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.'

*Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004).

The Ninth Circuit has held that a substantial burden on religious exercise must impose a "significantly great restriction or onus upon such exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)). Finally, the Eleventh Circuit has held that a substantial burden is one that results "from pressure that tends to force adherents to forgo religious precepts or from pressure that mandates religious conduct." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004).

### 1. Service of Exclusively Cold Meals

I first will address Couch's claims that his right to freely exercise his religion under both the First Amendment and RLUIPA were violated when the defendants served him exclusively cold meals during a lockdown period that coincided with part of Ramadan 2003. I find that such actions on the part of the defendants did not substantially burden the free exercise of Couch's religion. Couch does not contend that being served hot meals is a requirement under Islamic tenets during the Ramadan fasting period, nor does Couch claim that such is central to his own subjective

-23-

religious beliefs.[9]  In fact, Couch does not specify how the exercise of his religious beliefs was substantially burdened by being served exclusively cold food during the lockdown that coincided with part of Ramadan 2003.  However, viewing the facts in the light most favorable to Couch and construing Couch's pro se complaint liberally, see *Haines v. Kerner*, 404 U.S. 519, 520 (1972),[10] it can be argued that Couch is contending that being served such cold meals during this period diminished the overall spiritual experience of Ramadan.  However, even so construing Couch's complaint, I cannot find that being served exclusively cold meals during only part of Ramadan constitutes a substantial burden on the free exercise of Couch's religion.  Despite being served cold food, he, and the other Muslim inmates were, nonetheless, given the opportunity to fast during Ramadan.  Couch makes no allegation that he was significantly pressured to break the fast in order to receive hot meals, nor does he present evidence that other fasting inmates broke the fast on this basis.  Moreover, Couch does not contend that eating such cold meals was hazardous to his health in any way or resulted in any medical problems.

As the Seventh Circuit reasoned in *Al-Alamin v. Gramley*, 926 F.2d 680, 688 (7th Cir. 1991), here, Keen Mountain made special accommodations for providing inmates the opportunity to participate in the Ramadan fast.  Moreover, I find that the fact that the defendants made such accommodations satisfies the First Amendment

---

[9]Although the alleged burden by the defendants need not be upon a mandatory religious practice, I, nonetheless, note that the service of hot meals is not mandated by Islamic tenets because it is one factor to be considered in determining whether Couch's free exercise of his religion was substantially burdened.

[10]In *Haines*, the Supreme Court held that the allegations of a pro se complaint are held to less stringent standards than formal pleadings drafted by attorneys.  *See* 404 U.S. at 520.

regardless of Couch's complaints that the specific accommodations made by prison officials were not to his liking. *See Al-Alamin*, 926 F.2d at 688. In particular, the fact that Keen Mountain serves exclusively cold meals to Ramadan fast participants during the lockdown period that happened to coincide with part of Ramadan, and that Couch prefers not to eat exclusively cold meals during this time period, simply does not rise to the level of a constitutional violation. Likewise, the Seventh Circuit noted in *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988), that inmates are not average citizens, but convicted criminals and, therefore, "cannot expect the amenities, conveniences and services of a good hotel." Again, I note that Couch, as well as all World Community and NOI members, were given the opportunity by the defendants to observe the month of fasting at the prison in accordance with Islamic tenets. For all of these reasons, I find that Couch's free exercise of his religion was not substantially burdened by the defendants' service of exclusively cold food during the lockdown that coincided with part of Ramadan 2003. Therefore, I find that the defendants are entitled to summary judgment on this ground. Given this disposition, I find it unnecessary to address Couch's equal protection and due process claims in relation hereto.

While Couch has not framed his cold food claim in terms of an Eighth Amendment claim, as the defendants correctly note in their brief, such claims typically are classified as such. Further, because Couch is a prisoner proceeding pro se, I will liberally construe his complaint to allege such a claim. *See Haines*, 404 U.S. at 520.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. This amendment not only prohibits

-25-

excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). Moreover, the Fourth Circuit has held that a prisoner must suffer a "serious or significant physical or mental injury" in order to be "subjected to cruel and unusual punishment within the meaning of the" Eighth Amendment. *White v. Gregory*, 1 F.3d 267, 269 (4th Cir. 1993) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381(4th Cir. 1993); *see also Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir. 1990) (quoting *Shrader v. White*, 761 F.2d 975, 979 (4th Cir. 1985). The Court stated as follows in *Strickler*:

> The Eighth Amendment does not prohibit cruel and unusual prison conditions; it prohibits cruel and unusual punishments. If a person has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the [Eighth] Amendment.

989 F.2d at 1381.

As the Court in *Strickler* noted, "[a]t a minimum, an inmate must specifically describe not only the injury but also its relation to the allegedly unconstitutional condition." 989 F.2d at 1381 n.9.

The Supreme Court has described two general categories of Eighth Amendment claims in the prison setting: those involving "conditions of confinement" and those involving "excessive use of government force." *Thaddeus-X v. Blatter*, 175 F.3d 378, 401-02 (6th Cir. 1999). In *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976), the Supreme Court acknowledged that "punishment" could go beyond that which was specifically part of the sentence and could include the conditions facing the inmate once

imprisoned. All Eighth Amendment claims have an objective component. In *Estelle*, the Supreme Court determined that the objective component encompasses not only "physically barbarous punishments," but also the infliction of "unnecessary suffering [that] is inconsistent with contemporary standards of decency." 429 U.S. at 102-03. When the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element also must be attributed to the inflicting officer in order to make out the subjective component of an Eighth Amendment violation. *See Wilson v. Seiter*, 501 U.S. 294, 300 (1991). However, the subjective prong differs in the two sets of cases; that is, the state of mind necessary in order to find a prison official in violation of the Eighth Amendment depends on the nature of the case -- whether it describes the conditions of confinement facing the inmate, or alternatively involves the excessive use of force against him.

Here, Couch's complaint undoubtedly challenges the conditions of his confinement. In *Wilson*, 501 U.S. at 302-03, the Supreme Court held that in a prison conditions case, wantonness entails "deliberate indifference." In *Helling v. McKinney*, 509 U.S. 25, 36 (1993), the Supreme Court held that an inmate stated a cognizable claim under the Eighth Amendment and that the subjective component would require a showing that prison officials were deliberately indifferent to a substantial risk of harm to his health -- the fact that the potential medical injury lay in the future did not change the analysis. As stated above, the objective element would require a showing that society considers the risk he faces "to be so grave that it violates contemporary standards of decency to expose anyone unwillingly" to it. In *Farmer v. Brennan*, 511 U.S. 825, 837 (1994), the Supreme Court more specifically defined the term "deliberate indifference" in the Eighth Amendment context to mean that the individual

prison official was aware of the risk to the inmate's health and was deliberately indifferent to it.

While the Fourth Circuit has not addressed whether serving an inmate cold food can constitute a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, other circuits have. For instance, in *Blatter*, the court noted that cold food is an ordinary incident in prison life. In *Dean v. Campbell*, 1998 WL 466137 at *2 (6th Cir. Jul. 30, 1998), the Sixth Circuit held that an inmate's allegation of cold meals for a short period of time failed to allege facts showing that the inmate was subjected to the type of extreme deprivations which are necessary for an Eighth Amendment conditions of confinement claims. In *Johnson v. Horn*, 150 F.3d 276, 282 (3d Cir. 1998), the court held that serving cold food instead of kosher food to an inmate did not violate his First Amendment rights. In *Brown-El v. Delo*, 969 F.2d 644, 648 (8th Cir. 1992), the court held that a prisoner's constitutional rights were not violated when he was served cold food. In *Madyun v. Thompson*, 657 F.2d 868, 874-75 (7th Cir. 1981), the court held that an allegation that food served to segregated prisoners was cold and not on the menu served to general population prisoners was insufficient to state an Eighth Amendment claim. In *Prophete v. Gilless*, 869 F. Supp. 537, 538 (W.D. Tenn. 1994), the court held that cold food does not pose a danger to inmate health and thus does not constitute a deprivation of a necessity of life. In *Smith v. Copeland*, 892 F. Supp. 1218, 1229 (E.D. Mo. 1995), *aff'd*, 87 F.3d 265 (8th Cir. 1996), the court held that a diet of cold food, in and of itself, does not offend the Constitution. In *Cruz v. Jackson*, 1997 WL 45348 (S.D. N.Y. Feb. 5, 1997), the court held that a prisoner's allegation that he was served cold food for four months was insufficient to give rise to an Eighth Amendment claim. In *Ivy v. Washington*, 1996

-28-

WL 685455 (N.D. Ill. Nov. 25, 1996), the court held that a claim of being served cold food does not state an Eighth Amendment violation. In *Williams v. Washington*, 1996 WL 137670 (N.D. Ill. Mar. 25, 1996), the court held that receiving meals delivered cold did not exceed deprivations one could expect from prison life. In *Vinegar v. Fairman*, 1995 WL 769758 (N.D. Ill. Dec. 29, 1995), the court rejected a claim that being served cold food violated the Eighth Amendment, noting that the Constitution requires only that inmates receive adequate nutrition. In *Fisher v. Dep't of Corr.*, 1995 WL 608379 (S.D. N.Y. Oct. 16, 1995), the court held that a prisoner's claim that his food was served cold did not rise to the level of a constitutional violation. In *Flournoy v. Sheahan*, 1994 WL 605584 (N.D. Ill. Nov. 2, 1994), the court held that being served cold food is not a constitutional violation. In *Watson v. Sheahan*, 1994 WL 95782 (N.D. Ill. Mar. 18, 1994), the court ruled that a prisoner failed to explain how the alleged conditions of eating cold food without certain utensils while standing up or sitting on the floor present an immediate danger to his health. In *Cunningham v. Jones*, 567 F.2d 653, 659-60 (6th Cir. 1977), the court observed that complaints about the preparation or quality of prison food "would generally be far removed from Eighth Amendment concerns." Finally, as previously mentioned, in *Harris*, 839 F.2d at 1235, the Seventh Circuit held that inmates are not average citizens, but convicted criminals and, therefore, "cannot expect the amenities, conveniences and services of a good hotel." Likewise, in *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), the Supreme Court stated that "the Constitution does not mandate comfortable prisons and [those] which house persons convicted of serious crimes, cannot be free of discomfort."

Thus, although the Fourth Circuit has not addressed the issue of whether the

-29-

service of cold food to an inmate violates the Eighth Amendment's prohibition against cruel and unusual punishment, numerous other courts have held that it simply does not. I can find no reason to distinguish the case before me now from those cited above. Moreover, Couch has failed to show that the defendants were aware of any risk of harm to Couch's health and were deliberately indifferent to it. In fact, Couch does not submit to the court that the consumption of cold food during the lockdown that coincided with part of Ramadan 2004 was harmful to his health. In his complaint, he alleges that he lost approximately 13 pounds during Ramadan, but he does not allege that this was due to being served cold food. Thus, for all of these reasons, I find that, even viewing the facts in the light most favorable to Couch, they simply do not rise to the level of a constitutional violation under the Eighth Amendment. That being the case, I find that Couch has failed to state a constitutional violation and, therefore, I find that the defendants are entitled to summary judgment on this claim.

### 2. *Service of Inadequate Calories and Nutrition*

I next will address Couch's claim that the meals served by the defendants to him as well as to the other World Community fast participants during Ramadan 2004, were inadequate in nutritious value and caloric content, in violation of his right to freely express his religious beliefs under both the First Amendment and RLUIPA. It has been held that inmates are entitled to receive adequate nutrition and calories. *See Shrader*, 761 F.2d at 986 (holding that inmates must be provided nutritionally adequate food); *see also Bolding v. Holshouser*, 575 F.2d 461 (4th Cir. 1978); *Bowring v. Godwin*, 551 F.2d 44 (4th Cir. 1977). Viewing the facts in the light most favorable to Couch, I find that Couch has demonstrated a substantial burden on the free exercise

-30-

of his religion.  In his complaint, Couch contends that he was deprived during this time period of one-half to two-thirds of the nutrition and calories that the VDOC would have provided him had he not fasted during Ramadan.  Specifically, Couch contends that he was provided approximately 1000 calories per day during this time period as opposed to the 2800 calories that general population prisoners are to be provided according to VDOC policy.  The defendants note that because Couch voluntarily chose to fast, he was aware that he would be receiving a reduced amount of food and calories during this time.  The defendants argue that this is what is implied by the word "fast."  However, Couch has explained in his complaint that the period of fasting during Ramadan applies only to the daylight hours.  Thus, fasting inmates receive a predawn meal and an evening meal after sunset.  He contends that Muslims fasting during Ramadan are allowed to consume an unlimited amount of calories from sunset until dawn.  I must further note that Couch states in his complaint that during periods of lockdown at the prison, inmates are not allowed to make food purchases from the prison commissary.  Therefore, at least during these lockdown periods, inmates have no way to supplement their diets. Moreover, given the general definition of fast, which is to abstain from food or to eat sparingly or to abstain from some foods, and especially considering the Ramadan fast, which only occurs during the daylight hours, I find that a genuine issue of material fact exists as to whether the defendants provided Couch with adequate nutrition and calories in violation of Couch's constitutional and statutory rights to freely exercise his religion.[11]  Thus, I find that, viewing the facts in the light most favorable to Couch, a reasonable jury could find that inmates participating in the fast, receiving only 1000 daily calories, were substantially pressured to break the fast, in violation of Islamic tenets, in order

---

[11]*See* http://www.m-w.com/cig-bin/dictionary.

-31-

to satisfy their physical hunger.

Just what constitutes adequate nutrition and calories is best determined on a case-by-case basis. Here, Couch alleges that he was provided only 1000 daily calories during Ramadan 2004. He further alleges, and the defendants admit, that VDOC policy provides that inmates be provided 2800 calories during normal prison operations. Nonetheless, in response to Couch's argument, the defendants merely state that Couch voluntarily chose to fast and should have known that he would be receiving a decreased amount of calories during Ramadan.[12] However, as Couch states in his complaint, Muslims are only obligated to fast during the daylight hours. They may consume an unlimited amount of calories from sunset until dawn. Thus, I am not persuaded by the defendants' argument that Couch should necessarily have known that his total daily caloric intake would be so drastically reduced. Moreover, the defendants never actually address whether the meals served to Couch and the other fasting World Community inmates during Ramadan 2004 were either nutritionally or calorically inadequate. Nor do they advance any governmental interest, either legitimate or compelling, that was furthered by the service of such meals during this time period. That being the case, it is impossible at this time for this court to determine whether such an interest exists. For all of these reasons, I find that there exists a genuine issue of material fact precluding summary judgment on this issue. That being the case, the defendants' motion for summary judgment will be denied on this ground.

---

[12]Again, I note that, despite such a contention by the defendants, Muslims are only obliged to fast during the daylight hours. Thus, I cannot find that Couch should necessarily have known that his total daily caloric intake would be so drastically reduced.

-32-

Couch also argues that his rights to due process under the Fifth Amendment and his right to equal protection under the Fourteenth Amendment were violated when the defendants served larger portions to the NOI inmates during Ramadan 2004. Specifically, Couch alleges that the predawn meal served each day of Ramadan to all fasting inmates was substantially smaller than the hot breakfast served to the nonfasting general population. Moreover, Couch contends that during the lockdown that coincided with part of Ramadan 2004, the defendants served the NOI fasting inmates a larger, hot evening meal.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV. The Equal Protection Clause keeps governmental decisionmakers from treating differently persons who are in all relevant aspects alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). In order to successfully state an equal protection claim, a plaintiff first must demonstrate that he has been "treated differently from others whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison*, 239 F.3d at 654. Once such a showing is made, the court must then determine whether the disparity in treatment can be justified under the requisite level of scrutiny. *See City of Cleburne*, 473 U.S. at 439-40; *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir. 1999).

Although a prisoner does not forfeit his constitutional right to equal protection by having been convicted of a crime and imprisoned, prisoner claims under the Equal

Protection Clause must be analyzed in light of the special security and management concerns in the prison system. *See Morrison*, 239 F.3d at 655 (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977)).

Here, it is clear that Couch and the other fasting World Community members were treated differently from the general population inmates in that the general population inmates received larger breakfast meals. However, it is clear that the two groups of inmates were not similarly situated, in that the fasting members were fasting, while the general population inmates were not. Further, I find that Couch and the other fasting World Community members were similarly situated to the fasting NOI members only insofar as they both were groups of Muslim inmates observing the period of fasting during Ramadan. However, I further find that the two groups were not ultimately similarly situated because, as the defendants note, the NOI mandates a much stricter diet than must be adhered to by the World Community Sunni Muslims. For instance, in his affidavit, Oslin testified that the fasting NOI inmates required special foods, consisting primarily of fish, navy beans and a few fresh vegetables. He noted that their dietary laws were "much more strict."

Therefore, I find that Couch cannot show that he and the other World Community fasting inmates are similarly situated to the NOI fasting inmates given the difference in dietary laws. Moreover, even if the two groups were deemed similarly situated, I find that, given the NOI's much stricter dietary laws, the defendants have provided ample justification for such disparate treatment. Thus, for all of these reasons, I find that, even viewing the facts in the light most favorable to Couch, the defendants are entitled to summary judgment on his equal protection claim with

regard to being served inadequate nutrition and calories during Ramadan 2004.

Couch further alleges that the defendants violated his Fifth Amendment right to due process by serving him inadequate calories and nutrition during Ramadan 2004. Specifically, Couch states in his complaint that, although prison officials posted general information regarding the period of fasting, including such things as the times for the predawn and evening meals and prohibitions about taking the lunch meals, prison officials did not inform any inmate that if he chose to fast during Ramadan, he would be deprived of more than half of his daily nutrition and calories.

The initial inquiry in any due process claim is whether the plaintiff has demonstrated that he has been deprived of a protected liberty interest by the state. *See Sandin v. Conner*, 515 U.S. 472, 477-78 (1995). At issue here, is whether Couch had a protected liberty interest in receiving the VDOC's recommended daily intake of approximately 2800 calories. I find that there is a dispute in a genuine issue of material fact precluding the award of summary judgment in the defendants' favor on this issue. Specifically, the defendants contend that, given the voluntary nature of the fast, it cannot be found that Couch was deprived of a protected liberty interest by the state. The defendants claim that the prison posted all relevant information regarding the Ramadan fast so that inmates could make an informed decision regarding whether to participate therein.[13] Nonetheless, Couch alleges that no information was posted regarding the fact that the inmates' daily caloric intake and nutrition would be so greatly reduced, thereby nullifying the defendants' argument that he voluntarily

---

[13]In his Level-II response to Couch's December 10, 2004, grievance, Huffman stated that "the [DOC] allows voluntary participation in the religious fast by all inmates wishing to observe the religious month and posts all pertinent information prior to its beginning so that the inmate population is informed prior to the onset of Ramadan."

consented to such a reduction in calories and nutrition.  For these reasons, I will deny the defendants' motion for summary judgment on this ground.

### 3.  Denial of Eid ul Fitr Meal Following Ramadan 2003

In his complaint, Couch alleges that the defendants deprived him of the *Eid ul Fitr* meal following Ramadan 2003.  Couch states that the *Eid ul Fitr* meal is a special meal served one to three days after the completion of Ramadan to celebrate the 30 days of fasting.  He further states that Muslims may only take part in the meal *after* Ramadan and that Muslims are prohibited from fasting on the day of the *Eid ul Fitr* meal.  Couch further states that because prison officials control the feeding of the prisoners, he and the other World Community members must begin and end the 30-day fasting period when prison officials provide the predawn and evening meals for the Muslims.  In 2003, Keen Mountain observed Ramadan beginning on October 27, 2003, and ending on November 25, 2003.  Couch contends that, in violation of Islamic tenets, the defendants served what they described as the *Eid ul Fitr* meal on the evening of November 25, 2003, the final day of Ramadan and after Couch and the other Muslims had fasted throughout the day.  In essence, Couch's claim is that the defendants served the 2003 *Eid ul Fitr* meal *during* Ramadan instead of one to three days *after* Ramadan as required by Islamic religious tenets.  The defendants note that, after conducting some research when Couch filed his grievance, they determined that Ramadan actually began on October 26, 2003, and ended on November 24, 2003.  Thus, they contend that their service of the *Eid ul Fitr* meal on November 25, 2003, was permissible.

-36-

Viewing the facts in the light most favorable to Couch, I first find that Couch's freedom to exercise his religion was substantially burdened by the defendants' actions of serving the *Eid ul Fitr* meal *during* Ramadan as opposed to afterwards. As emphasized by Couch, Islamic tenets require that the *Eid ul Fitr* meal be served within three days after the completion of Ramadan. I find that the service of such meal during Ramadan, in essence, would strip it of its heightened religious significance to Couch and the other World Community Muslims, thereby, essentially denying them the *Eid ul Fitr* meal. Thus, for these reasons, I find that the defendants substantially burdened Couch's freedom to exercise his religion.

Next, I must determine whether the defendants have advanced a compelling governmental interest under RLUIPA or a legitimate governmental interest under the First Amendment that was furthered by the service of the *Eid ul Fitr* meal on November 25, 2003. In their responses to Couch's grievance, the defendants contend that research conducted in connection with that grievance revealed that Ramadan of 2003 lasted from October 26, 2003, through November 24, 2003. Thus, the defendants claim that the *Eid ul Fitr* meal served on November 25, 2003, was served on the day *after* Ramadan had ended and the date actually identified on the Islamic calendar as being the day for the *Eid ul Fitr* meal. I find that, as Couch contends, this research conducted *after* the *Eid ul Fitr* meal was served and in response to Couch's grievance, cannot serve as a legitimate basis for the defendants' initial decision to serve the meal on November 25, 2003. Moreover, Couch notes that the Islamic calendar used by the defendants to reach this conclusion specifically states that its dates are based on estimates which could be wrong by two days. In any event, Couch has produced evidence that the defendants initially informed him that the decision to

-37-

serve the *Eid ul Fitr* meal on November 25, 2003, was based on "institutional need." In particular, Couch alleges that on November 21, 2003, prison counselor and Ramadan coordinator, D. R. Vass, approached Couch, as World Community liaison, and informed him that Couch's requested and tentatively approved date for the meal, November 26, 2003, had been moved to November 25, 2003, due to institutional need. Couch contends that he complained to Vass that the *Eid ul Fitr* meal could not be served on that date according to Islamic tenets. However, Couch alleges that Vass told him that institutional needs and security concerns trumped these religious needs. Couch claims that Vass explained the institutional need was that food service workers and other staff wanted to go home early on November 26, 2003, to prepare their own Thanksgiving meals. Moreover, Couch alleges that after filing his grievances, Oslin met with him and explained that the institutional need actually was that there would be a lack of oven space in the prison kitchen to prepare the *Eid ul Fitr* meal for the Muslims and the Thanksgiving meal for the general population inmates. Couch contends that when he pointed out to Oslin that the *Eid ul Fitr* meal could have been served on November 28, 2003, in compliance with Islamic tenets, Oslin conceded that was true. Couch states that Oslin attempted to persuade him to withdraw his grievance, and when he refused, the defendants abandoned their rationale of "institutional need" to then assert that research of the Islamic calendar justified their timing of the *Eid ul Fitr* meal.

In his affidavit, Oslin testified that he did not recall Couch informing him of his conversation with Vass, nor did he recall the date of the *Eid ul Fitr* meal being changed. Oslin further testified that the prison kitchen does not shut down for any holiday. Furthermore, Oslin testified in his affidavit that he did not recall having a

conversation with Couch in which he advised him of a lack of oven space for the preparation of two large meals.

I find that it is clear that there is a dispute as to a genuine issue of material fact, namely the defendants' reason for holding the *Eid ul Fitr* meal on November 25, 2003, thereby making it impossible to determine at this time whether the defendants have advanced a compelling or even a legitimate governmental interest that was furthered by holding the meal on this date. Thus, I will deny the defendants' motion for summary judgment on this ground.

### 4. *Denial of Eid ul Fitr Meal Following Ramadan 2005*

In his amended complaint, Couch also claims that the defendants denied him the *Eid ul Fitr* meal following Ramadan 2005. Specifically, he contends that the defendants held the *Eid ul Fitr* meal four days after Ramadan ended, in violation of Islamic tenets requiring that the meal be held within three days following the end of Ramadan. Couch states that Ramadan was observed at Keen Mountain during 2005 from October 5 through November 4 and states that the *Eid ul Fitr* meal was held on November 7, 2005, four days after Ramadan ended.

In response to Couch's grievance, the defendants do not dispute the dates as cited by Couch. However, they contend that their actions were in accord with VDOC policies. In particular, they note that Deputy Director Jabe circulated two memoranda regarding the observance of Ramadan 2005. The first memorandum was dated August 29, 2005, and directed the prison to observe Ramadan beginning on the evening of

-39-

October 5, 2005, with the first day of fasting to begin at dawn on October 6, 2005, and continue for 30 days until sunset on November 4, 2005. Jabe sent out a second memorandum, dated September 21, 2005, informing prison officials that the Ramadan religious observances would start on the evening of October 4, 2005, with the first full day of fasting on October 5, 2005. Thus, Jabe's second memorandum instructed prison officials to begin Ramadan 2005 fasting one day earlier than the initial memorandum. However, the second memorandum failed to advance the ending date of Ramadan from November 4, 2005, to November 3, 2005.

Couch contends that the defendants did, in fact, violate VDOC policy because VDOC policy states that the *Eid ul Fitr* meal was to be held no later than a date within three days of the end of Ramadan, which would have been November 6, 2005. However, they improperly held it on November 7, 2005, *four* days after Ramadan ended. Moreover, Couch contends that Huffman, in his Level-II response, did not deny that prison officials extended Ramadan to 31 days. Instead, he simply states that "Departmental policies and procedures have been followed." However, Couch alleges that Huffman did not address the fact that prison officials used Jabe's second memorandum to determine the starting date for Ramadan 2005, but improperly relied on the initial memorandum to determine the ending date.

I will first address whether Couch's freedom to express his religion was substantially burdened by the defendants' service of the *Eid ul Fitr* meal on November 7, 2005. Viewing the facts in the light most favorable to Couch by assuming that the defendants did, in fact, serve the *Eid ul Fitr* meal four days after the end of Ramadan, in violation of Islamic religious tenets, I find that such service of the meal four days

after Ramadan did substantially burden Couch's free exercise of his religion because, under Islamic tenets, the service of a meal more than three days after the end of Ramadan would not be considered an *Eid ul Fitr* meal. That being the case, I find that, viewing the facts in the light most favorable to Couch, the defendants' actions substantially burdened the free exercise of his religion. I next must address whether the defendants have shown a compelling or a legitimate governmental interest that was furthered by holding the *Eid ul Fitr* meal more than three days after Ramadan ended. As noted above, the defendants merely state that "Departmental policies and procedures were followed," relying on the memoranda circulated by Jabe. However, viewing the facts in the light most favorable to Couch, it appears that prison officials relied on Jabe's second memorandum changing the start date of Ramadan one day earlier than set forth in the initial memorandum, while relying on the initial memorandum as opposed to the second memorandum to determine the end date, and thereby improperly extending Ramadan to 31 days. The defendants' contention, simply that they followed departmental policies and procedures, makes it impossible for the court at this time to determine whether there was a legitimate or a compelling governmental interest that was furthered by holding the *Eid ul Fitr* meal on November 7, 2005. Therefore, I will deny the defendants' motion for summary judgment on this ground.

### 5. Denial of the 2004 Eid ul Fitr Prayer Service

Couch's last remaining claim is that the defendants denied him of the *Eid ul*

*Fitr* prayer service following Ramadan 2004.[14]  Specifically, Couch alleges that Jabe sent a memorandum dated September 1, 2004, to all wardens and superintendents, authorizing them to allow the Muslim inmates to conduct the *Eid ul Fitr* prayer service.  Couch notes that on September 20, 2004, he, as liaison for the World Community at Keen Mountain, requested that they be permitted to perform the *Eid ul Fitr* prayer service in the visiting room from 8:15 a.m. to 9:50 a.m. on November 15, 2004, the day after Ramadan ended, in accordance with Islamic tenets.[15]  Couch contends that on October 1, 2004, Assistant Warden Phillips authorized Couch's request.  However, Couch alleges that when he and other World Community members arrived at 8:15 a.m. on November 15, 2004, at the visiting room for the prayer service, the security staff refused to let them conduct the prayer service.  When Couch asked the watch commander to contact Assistant Warden Phillips, he was informed that Phillips was "unavailable."  Couch and the other World Community members were unable to conduct the prayer service at that time.

Couch filed an informal complaint on November 21, 2004, to Phillips, who forwarded it to security for a response.  When security did not respond, Couch filed a formal grievance.  In response to Couch's grievance, Chief of Security, Major K. Pickerel, met with Couch to investigate the matter.  Couch claims that Pickerel accepted full responsibility for the refusal of the *Eid ul Fitr* prayer, stating that it was his "error."  Couch claims that Pickerel further stated that he had spoken with Phillips

---

[14]As previously noted, Ramadan 2004 was observed at Keen Mountain from October 15, 2004, through November 14, 2004.

[15]Couch states in his complaint that the *Eid ul Fitr* prayer service must be held the morning on the first day following the completion of Ramadan.

-42-

about the matter and that Phillips did not remember sending the written authorization for the *Eid ul Fitr* prayer service. Pickerel stated that he had been unable to locate any such memorandum. Couch claims that Pickerel repeatedly stated that the error was his and that it resulted from a "comedy of errors." Couch alleges that Pickerel asked him to withdraw the grievance, but he refused to do so, instead asking Pickerel what he intended to report to the grievance coordinator. Couch claims that Pickerel assured him that he would report that Couch had been deprived of the *Eid ul Fitr* prayer service as a result of a "comedy of errors" by security staff.

Couch alleges in his complaint that on December 21, 2004, Phillips met with Couch absolving all other staff from responsibility for the denied prayer service and accepting full responsibility himself. Specifically, Phillips stated that he did not remember sending Couch any written authorization to conduct the prayer service. However, Couch contends that Couch had the memorandum with him and when he offered it to Phillips, Phillips declined to accept it because he said he believed Couch. Couch alleges that Phillips asked him to withdraw his grievance, but he again declined to do so.

Couch states that on January 3, 2005, the warden deemed the grievance unfounded because the *Eid ul Fitr* prayer service had been allowed, but Couch had voluntarily chosen not to attend. Specifically, the warden determined that on November 10, 2004, Warden Bassett sent a memorandum to all fast participants advising them that the *Eid ul Fitr* prayer service would be held on November 17, 2004, at 6:00 p.m. in the dining halls. Couch alleges that he questioned each fast participant and none had received or seen any memorandum from prison officials

-43-

regarding the *Eid ul Fitr* prayer service. At that point, Couch states that Phillips conceded that the memorandum may not have been posted, and he explained that the prison suffered a longstanding problem of memoranda and notices being forwarded to security for posting, but not being posted. He claims that Phillips further stated that prison officials were seeking a reliable method to insure that in the future memoranda were properly posted.

When Couch appealed the warden's Level-I response to Huffman, he also deemed Couch's grievance unfounded. Couch argues that the memorandum from the warden, which was never posted, in any event, proves that he was denied the *Eid ul Fitr* prayer service because it states that the service was to be held at 6:00 p.m. in violation of Islamic tenets, which require that the *Eid ul Fitr* prayer be held on the *morning* of the first day following the completion of Ramadan. Couch further contends that the *Eid ul Fitr* prayer must be performed in congregation, meaning that there would be "row upon row of Muslims all prostrating simultaneously." However, the warden's memorandum directed that the prayer be conducted in the dining halls, thereby precluding them from performing the congregational prayer.[16] Couch further alleges that the warden's memorandum, dated November 10, 2004, was actually created after Couch's December 16, 2004, meeting with Pickerel regarding the denial of the *Eid ul Fitr* prayer service. Couch alleges that the warden's memorandum was backdated to November 10, 2004, in an effort to avoid responsibility for depriving him of the prayer. To support this allegation, Couch contends that when Couch and

---

[16]Specifically, Couch states that the dining halls consist of metal dining tables bolted to the floor with narrow walkways between them and only a three-foot clearance between the outer row of tables and the walls, making it physically impossible for the 50+ Muslims who attended the *Eid* meal to perform a congregational prayer in the dining halls.

other World Community Muslims arrived at the visiting room at 8:15 a.m. on November 15, 2004, they were denied entry because security staff had no memorandum authorizing the prayer service. He further alleges that the watch commander made several telephone calls to various prison officials and searched various files, seeking any memorandum authorizing the prayer service. He concludes that if there had been a memorandum dated November 10, 2004, indicating that the prayer service was scheduled for November 17, 2004, then, presumably, security staff would have explained to Couch that the prayer service had been rescheduled.

Couch further contends that during his meeting with Pickerel on December 16, 2004, Pickerel accepted full responsibility for the denied prayer service, called it a "comedy of errors" on the part of security staff, and explained that he had searched for, but had been unable to locate, any memorandum regarding the prayer service. Couch concludes that, had there existed such a memorandum, particularly one that had been disseminated to all fast participants, or even disseminated only to security staff for posting in the pods, then, presumably, the Chief of Security would have been able to locate it.

Next, Couch contends that Phillips sent to him and inmate Ali Miles[17] the October 1, 2004, memorandum authorizing the *Eid ul Fitr* prayer in the visiting room from 8:15 a.m. to 9:50 a.m. on November 15, 2004. However, in response to Couch's grievance, Pickerel told him that he had not seen, nor could he find, any October 1, 2004, memorandum by Phillips. Moreover, Phillips told Couch that he did not

---

[17]Ali Miles was the liaison for the NOI between the inmates at Keen Mountain and prison officials.

-45-

remember sending any such memorandum to Couch. Thus, Couch notes that the absence of any October 1, 2004, memorandum authorizing the *Eid ul Fitr* prayer necessitated the warden's November 10, 2004, memorandum authorizing the evening *Eid ul Fitr* prayer.

Further, Couch alleges that in preparation for Ramadan 2005, the warden posted for the prison population a Ramadan participation notice which is an exact verbatim duplicate of Phillips's October 1, 2004, memorandum. Couch claims that, undeniably, this notice from the warden was created using Phillips's October 1, 2004, memorandum, the very memorandum defendants claimed they neither possessed nor remembered. Couch contends that this shows that the defendants possessed Phillips's October 1, 2004, memorandum all along, suggesting no need for the warden's November 10, 2004, memorandum and bolstering Couch's contention that the warden's November 10, 2004, memorandum did not exist on November 10, 2004.

Finally, Couch alleges that the warden's November 10, 2004, memorandum directly conflicts with Jabe's Ramadan memorandum dated September 1, 2004, in which he authorized a *morning* prayer service. Thus, Couch contends that Warden Bassett would not, thereafter, authorize a night prayer service in direct conflict with the Deputy Director's memorandum unless such was necessary to rebut Couch's claims of deprivation.

In conclusion, Couch states that whether the November 10, 2004, memorandum was fabricated or whether prison officials simply failed to disseminate it to the fast participants, can be established only at trial. However, Couch states that it is certain

that the defendants deprived him and the World Community Muslims of an opportunity to observe the *Eid ul Fitr* prayer service.

I first must determine whether the defendants' actions of holding the *Eid ul Fitr* prayer service on November 17, 2004, at 6:00 p.m. in the dining halls substantially burdened Couch's freedom to exercise his religion. Couch alleges that the defendants deprived him of the *Eid ul Fitr* prayer service in three separate ways following Ramadan 2004. First, he contends that the prayer service was held outside of the time period prescribed by Islam. In particular, he states that Islam mandates that the prayer service be held the morning after the completion of Ramadan. Next, he contends that the prayer service was held in the evening, as opposed to the morning. Finally, he alleges that the prayer service was held in the dining halls, which precluded holding a congregational prayer as mandated by Islam. I find that the defendants' actions of holding the *Eid ul Fitr* prayer service on the third day following the completion of Ramadan 2004 substantially burdened the free exercise of Couch's religion because holding it outside of the proscribed time period effectively stripped it of its religious significance as the *Eid ul Fitr* prayer service. Likewise, aside from the fact that the prayer service was held outside of the proscribed time period, I find that holding the service in the evening, as opposed to the morning, had the same effect of stripping the service of its heightened religious significance as the *Eid ul Fitr* prayer service. However, I find that, aside from these problems, holding the prayer service in the dining halls, thereby precluding inmates from conducting the prayer service in a congregational manner, did not substantially burden Couch's free exercise of his religion. Specifically, I find that had the prayer service been held the morning following the completion of Ramadan, the fact that it could not have been performed

congregationally would not have imposed a substantial burden on Couch's freedom to exercise his religion. Regardless of being unable to perform the prayer service congregationally, it still would have held its significance as the *Eid ul Fitr* prayer. Only the manner in which it would have been performed would have been modified. That being the case, I find that Couch's freedom to exercise his religion was not substantially burdened by this fact alone. In any event, because Couch's freedom to exercise his religion was substantially burdened by the defendants' actions in holding the prayer service outside of the proscribed time period and during the evening, as opposed to the morning, I must next address whether the defendants have shown that a legitimate or a compelling governmental interest was furthered by holding the prayer service on November 17, 2004, at 6:00 p.m. After reviewing the defendants' pleadings, it does not appear that the defendants have advanced any reason for holding the prayer service on November 17, 2004. That being the case, I cannot, at this time, determine whether there is a compelling or legitimate governmental interest furthered by doing so. Therefore, I must deny summary judgment on this ground.

### C. *Qualified Immunity*

I first note that the defendants are not subject to a suit in their official capacities for monetary damages. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989). Couch has sued each defendant in both their individual and official capacities. Furthermore, among other things, he is seeking monetary damages from each defendant. Thus, I will dismiss Couch's claims insofar as he seeks monetary damages

from the defendants in their official capacities. Moreover, both the Supreme Court and the Fourth Circuit have held that state officials sued in their individual capacities are "persons" within the meaning of § 1983 and are not absolutely immune from personal liability under § 1983 solely by virtue of the official nature of their acts. *See Hafer v. Melo*, 502 U.S. 21, 30-31 (1991); *White*, 1 F.3d at 269-70. However, government officials may have qualified immunity from civil liability for performing discretionary functions only insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As the Fourth Circuit recently noted in *Carr v. Deeds*, 453 F.3d 593, 600 (4th Cir. 2006), "[b]ecause '[q]ualified immunity is an entitlement not to stand trial or face the other burdens of litigation ... rather than a mere defense to liability,' it is important to 'resolv[e] immunity questions at the earliest possible stage in litigation.'" (quoting *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)) (internal quotation marks and citations omitted).

A claim of qualified immunity is evaluated using a three-step analysis. First, the court must determine "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002); *see also Saucier*, 533 U.S. at 201. Second, the court must "inquire whether at the time of the alleged violation [the right] was clearly established." *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990) (Phillips J., concurring). Third, the court must determine whether a "reasonable person in the official's position would have known that his conduct would violate that right." *Collinson*, 895 F.2d at 998 (Phillips J., concurring).

I will address each of Couch's remaining claims in turn regarding whether the

-49-

defendants are entitled to qualified immunity.

### 1. Deprivation of Hot Meals in 2003

Given my finding above that the defendants' action of denying Couch and the other fasting World Community inmates of all hot meals during a lockdown period that coincided with part of Ramadan 2003 did not substantially burden Couch's freedom to exercise his religion, I now find that Couch's allegations, even if deemed true, do not establish a constitutional violation under the First Amendment or a statutory violation under RLUIPA. That being said, I find that the defendants are entitled to qualified immunity on this claim.

### 2. Deprivation of Adequate Calories and Nutrition in 2004

Given my finding above that it is impossible for the court to determine at this time whether there exists a compelling or even a legitimate governmental interest furthered by the service of 1000 daily calories during Ramadan 2004, I now find that granting the defendants qualified immunity at this time on this claim also is inappropriate.

### 3. Denial of the Eid ul Fitr Meals

For the same reasons as stated above, namely that it is impossible for the court to determine at this time whether a compelling or a legitimate governmental interest was furthered by holding the *Eid ul Fitr* meals when the defendants did in 2003 and

2005, I cannot find that the defendants are entitled to qualified immunity on Couch's claims that he was denied the *Eid ul Fitr* meals during those years.

### 4. Denial of the Eid ul Fitr Prayer Service in 2004

Again, for the same reasons, namely that it is impossible at this time to determine whether a compelling or even a legitimate governmental interest was furthered by holding the *Eid ul Fitr* prayer service on November 17, 2004, I now find that granting the defendants qualified immunity on this claim is inappropriate at this time.

### II. Conclusion

For all of the reasons stated herein, I will dismiss as being barred by the applicable statutes of limitation, the following claims:

1. Couch's claim under the First Amendment that he was deprived of all hot meals during a lockdown that coincided with part of Ramadan 2002; and

2. Couch's claim under the First Amendment that he was denied adequate nutrition and calories during Ramadan 2002.

I will dismiss the following claims for failure to exhaust administrative remedies under the PLRA:

1. Couch's claim under RLUIPA that he was deprived of all hot meals during a lockdown that coincided with part of Ramadan 2002;

2. Couch's claim under RLUIPA that he was denied adequate nutrition and

calories during Ramadan 2002;

3.  Couch's claims under the First Amendment and RLUIPA that he was deprived of adequate nutrition and calories during Ramadan 2003;

4.  Couch's claims under the First Amendment and RLUIPA that he was denied all hot meals during a lockdown period that coincided with part of Ramadan 2004;

5.  Couch's claims under the First Amendment and RLUIPA that he was deprived of adequate nutrition and calories during Ramadan 2005;

6.  Couch's claims under the First Amendment and RLUIPA that he was denied the *Eid ul Fitr* prayer service following Ramadan 2003;

7.  Couch's claims under the First Amendment and RLUIPA that he was denied the *Eid ul Fitr* meal following Ramadan 2004; and

8.  Couch's claims under the First Amendment and RLUIPA that he was denied the *Eid ul Fitr* prayer service following Ramadan 2005.

I will grant the defendants' motion for summary judgment on the following claims:

1.  Couch's claims under the First Amendment and RLUIPA that he was deprived of all hot meals during a lockdown that coincided with part of Ramadan 2003;

2.  Couch's Eighth Amendment claim regarding the service of exclusively cold meals during the lockdown that coincided with part of Ramadan 2003; and

3.  Couch's equal protection claim with regard to his allegation of being denied adequate nutrition and calories during Ramadan 2004.

I will deny the defendants' motion for summary judgment on the following

-52-

claims:

    1. Couch's claims under the First Amendment and RLUIPA that he was denied adequate nutrition and calories during Ramadan 2004;

    2. Couch's due process claim with regard to his allegation that he was denied adequate nutrition and calories during Ramadan 2004:

    3. Couch's claims under the First Amendment and RLUIPA that he was denied the *Eid ul Fitr* meal following Ramadan 2003;

    4. Couch's claims under the First Amendment and RLUIPA that he was denied the *Eid ul Fitr* meal following Ramadan 2005; and

    5. Couch's claims under the First Amendment and RLUIPA that he was deprived of the *Eid ul Fitr* prayer service following Ramadan 2004.

    Finally, I find that the defendants are entitled to qualified immunity on Couch's First Amendment and RLUIPA claims that he was deprived of all hot meals during a lockdown that coincided with part of Ramadan 2003.

    The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record and unrepresented parties at this time.

DATED:    September 22, 2006.


               /s/   *Pamela Meade Sargent*

               UNITED STATES MAGISTRATE JUDGE